UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

UNITED STATES OF AMERICA

                                16 Cr. 326 (ARR)

                -against-

MARQUEZ BRIDGES,

                         Defendant.

---------------------------------------------------------------------- x

### SENTENCING MEMORANDUM FOR
### DEFENDANT MARQUEZ BRIDGES

MICHAEL HUESTON, ESQ.
*Attorney for Defendant Marquez Bridges*
16 Court Street, Suite 1800
Brooklyn, New York 11241
(718) 246-2900

Mehmet Baysan, Esq.
*Associate Counsel for Defendant Marquez Bridges*

Dated:      Brooklyn, New York
              May 4, 2018

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

UNITED STATES OF AMERICA

              16 Cr. 326 (ARR)

       -against-

MARQUEZ BRIDGES,

           Defendant.

------------------------------------------------------------------------ x

**SENTENCING MEMORANDUM FOR
DEFENDANT MARQUEZ BRIDGES**

**A.  Introduction**

   Defendant Marquez Bridges places before the Court the following issues relating

to his appropriate sentence pursuant to Fed. R. Crim. P. 32.

   On August 29, 2017, Mr. Bridges pled guilty, pursuant to a plea agreement, to

Count One of a fifteen-count, fourth superseding indictment.  Count One charges that Mr.

Bridges violated 18 U.S.C. § 371, by conspiring to engage in the business of dealing

firearms without being a licensed dealer, and in the course of such business, shipped,

transported and received firearms in interstate and foreign commerce, contrary to 18

U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D).  *See* Presentence Investigation Report ("PSR")

at ¶¶ 1, 3.

   Mr. Bridges has been in custody since his arrest in Georgia on June 21, 2016.

   In the plea agreement, the parties agreed to disagree about the applicability of an

aggravating role enhancement pursuant to U.S.S.G. § 3B1.1.

   According to the defense, Mr. Bridges' total offense level is 22; he has a Criminal

History Category of I; and his advisory Guidelines range is 41 to 51 months.  The plea

agreement sets forth a total offense level of 24, with a Criminal History Category of I, and projects an advisory Guidelines range of 51 to 63 months, based on the application of U.S.S.G. § 3B1.1(c).  Initially, the PSR projected a total offense level of 26, based on the application of U.S.S.G. § 3B1.1(a), with a Criminal History Category of I, resulting in a 63 to 78 months advisory Guidelines range, and, pursuant to U.S.S.G. § 5G1.1(a), an effective advisory Guidelines range of 60 months.  *See* PSR at ¶¶ 45, 51, 54, 99.

After the defense submitted its objections to the PSR, pointing out that Probation had omitted the extensive role of a confidential witness ("CWI"), Probation took the unfortunate and meritless position that our objections equated to Mr. Bridges' lack of acceptance of responsibility under U.S.S.G. § 3E1.1, and revised its projected advisory Guidelines range to 97 to 121 months, again with an effective advisory Guidelines range of 60 months.  *See* Addendum to PSR, Acceptance of Responsibility, Offense Level Computation.

What is so regretful about the Probation's position is that rather than accepting responsibility for its own error, it continues to ignore the plea agreement, which provides a carve out regarding the applicability of U.S.S.G. § 3B1.1; and Mr. Bridges' plea minutes, attached hereto as Exhibit A, which show that his allocution is consistent with his objections.

For the reasons that follow, it is respectfully submitted that the circumstances of this case do not justify the application of U.S.S.G. § 3B1.1.  Mr. Bridges is also entitled to a 3-point reduction pursuant to U.S.S.G. § 3E1.1.  Furthermore, it is submitted that the 18 U.S.C. 3553(a) factors present justify a downward variance from the advisory Guidelines range to no more than 36 months incarceration, so as to reflect a sentence that

is sufficient but not greater than necessary to achieve the sentencing objectives of the statute.

Mr. Bridges asks the Court to focus on his work history and young children. Rising from adverse socio-economic circumstances, through hard work and commitment, Mr. Bridges obtained certification as a dental technician, and from 2009 until his arrest in this case remained consistently employed.  Inclusion of these factors in the calculation is consistent with the mandate that sentencing courts take into consideration all relevant facts related to defendants' backgrounds and histories.  The imposition of a sentence based upon a sentencing regime that fails to include critical information related to defendants' backgrounds fails to achieve this objective.

**B.     Comments and Objections to the Presentence Report; and Application of U.S.S.G. §§ 3B1.1 and 3E1.1**

By letter dated December 6, 2017, counsel submitted its objections and comments to the PSR.  A copy of that letter is attached hereto as Exhibit B.  The PSR incorrectly posits that, not only, did Mr. Bridges recruit straw purchasers, but that he also oversaw them and participated in the transfer of firearms and money.  The PSR inexplicably omitted the role of CWI – who by all indications became a cooperating witness after committing and becoming involved in the offense.  CWI oversaw, managed, and supervised the trafficking, including paying straw purchasers and transferring firearms out of state.  CWI played an integral and essential role in the crime.  This omission, of course, made Probation's assessment, regarding the application of U.S.S.G. § 3B1.1, unjustifiable and unfair.

As such, we, now object to Probation's recommendation to eliminate Mr. Bridges' three-point reduction for acceptance of responsibility.  Probation's decision to

use Mr. Bridges' objections against him – rather than acknowledge its failure to report

CWI's role in the offense in the first instance – is wrong for several reasons.

First, it ignores the fact that the plea agreement allows Mr. Bridges to dispute the

application of the aggravating role enhancement.  *See* Exhibit C at ¶ 2 (defendant

"reserves the right to challenge a Guidelines enhancement under U.S.S.G. § 3E1.1(c).")

Second, it fails to adequately acknowledge that, in its letter to Probation, the Government

agreed with the defense that not all the straw purchasers – namely Omar Walker – were

recruited by Mr. Bridges, that Mr. Bridges never personally transported any of the

firearms to New York, and, most importantly, that CWI was involved in the offense.

Third, it fails to acknowledge that Mr. Bridges' allocution is consistent with his

objections.  The Court specially asked Mr. Bridges about his role in the conspiracy, and

the following transpired:

> THE COURT: Okay. So what happened between October of 2015
> and March of 2016?
>
> THE DEFENDANT: C.W. 1 met the straw purchasers from
> contacts through me.
>
> THE COURT: Okay. So let's go back.
>
> Were there a number of people involved in who essentially reached
> an agreement be it a verbal agreement or a tacit agreement to work
> together to accomplish something?
>
> THE DEFENDANT: Yeah, some of the straw purchasers met
> C.W. 1 through me which they had an agreement to straw purchase
> firearms for C.W. 1.
>
> THE COURT: Okay. So I want to understand. You were working
> in agreement with C.W. 1, and C.W. 1 was working in agreement
> with you, and both of you were soliciting you called them straw
> purchasers. Is that people in the South to purchase guns for you.
>
> THE DEFENDANT: Yes.

4

*See* Exhibit A at pp. 17, 18.  The allocution continued:

> THE COURT: But you do think -- would you be using
> the straw purchaser to get the gun if you could have gotten the gun
> yourself?
>
> THE DEFENDANT: Yes, I was to the understanding that they will
> be giving a firearm to C.W. 1.

*See* Exhibit A at p. 19.  And the allocution further elicited:

> THE COURT: What was done with the guns? The guns were given
> to C.W. 1?
>
> THE DEFENDANT: Yes.
>
> THE COURT: What does C.W. 1 do with the guns?
>
> THE DEFENDANT: He was selling the guns.
>
> THE COURT: And where was he selling the guns?
>
> THE DEFENDANT: He was selling the guns locally in Georgia,
> and possibly in other states as in any states that he was familiar
> with. The possibility of New York or any other, I'm not a hundred
> percent sure.
>
> THE COURT: Did you have reason to believe that he was selling
> guns in places other than Georgia and New York?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Okay. And in joining all these people, who were
> making [an] effort to buy guns in Georgia and bring them up to
> New York, you were doing what you could to advance the goals of
> this.
>
> THE DEFENDANT: Yes.
>
> THE COURT: Securing the guns, transporting the guns, selling the
> guns in New York area of elsewhere?
>
> THE DEFENDANT: Correct. Could you ask that question again to
> make sure I understand.
>
> THE COURT: Absolutely, I just want to make sure that I
> understand what you are telling me which I think you are saying
> you assisted in this endeavor. You were a part of endeavor in order

to further it, to make it happen in order to get the guns purchased by the straw purchasers in Georgia, to make sure they are transported to wherever they're needed to go and sold wherever they needed to be sold which is outside of Georgia in many instances.

THE DEFENDANT**:** I would assist more the straw purchasers to make sure they get the firearms to C.W. 1 to make sure --

THE COURT**:** So you had an understanding about what he was doing so --

THE DEFENDANT**:** Yes, I understood that.

THE COURT**:** You were necessarily assisting him by getting him the guns, right?

THE DEFENDANT**:** Yes.

\* \* \*

THE COURT: Okay. Anything further?

MS. PAUL: The only minor clarification is whether or not Mr. Bridges is aware that it touched the Eastern District of New York.

*See* Exhibit A at pp. 20, 21.

As can be seen, Mr. Bridges' objections are consistent with his allocution and in no way deviate from the position he has taken since this case's outset. That is, his primary role was to introduce straw purchasers to CWI to obtain firearms that were transported and sold in various places in the United States. Contrary to Probation's position, he has not minimized his role. Rather, he rightly cried foul at Probation's aggravation of his role by way of omitting CWI's. Accordingly, we respectfully ask the Court to grant the three-point reduction as agreed upon by the parties. *See United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002) (courts review plea agreements in accordance with principles of contract law).

Further, as to the applicability of an aggravating role, Mr. Bridges does not deserve a two-point, much less a four-point enhancement.  First, Mr. Bridges did not receive firearms from the straw purchasers or compensate them for their involvement in the conspiracy.  *Compare*, *United States v. Bass*, 54 F.3d 125 (3d Cir. 1995) (evidence of possession of firearms before interstate shipment and receiving the same at the destination for buyers identified by the defendant was sufficient to conclude that defendant was a leader).  In fact, at least one straw buyer did not know and had never met Mr. Bridges.  *See* Eastern District of New York, 16 Cr. 326 (ARR), Document 146-1, Omar Walker's Motion to Sever, Exhibit C at ¶ 7 attached to the Affirmation of Daniel DeMaria, Document 146-1.

Indeed, CWI drove the conspiracy.  The disclosures in this case underscore this fact.  For example, in the attached Facebook correspondence between CWI and Mr. Bridges, CWI complains about Mr. Bridges' sporadic availability regarding his inquiries.  *See* Exhibit D.  This was a common feature in their relationship; and the defense's review of their correspondence shows that the majority of their contacts were initiated by CWI.

The level of CWI's involvement in this conspiracy is also reflected in some of the phone conversations he had had with some of the straw purchasers.  For instance, in a phone conversation with Ashanti Sease-Matthews, CWI extensively discussed payments, purchasing, and transporting firearms she obtained.  In that conversation, he also referred to her as the "female version of him."  A summary of that recoding, as well as the actual recording, are attached hereto as Exhibit E.  CWI's relationship with Dominique Chanel Fairnot is also important, as it is representative of many of the relationships initiated by Mr. Bridges that were later developed and managed by CWI – to the extent that CWI

dictated payment and other important terms without Mr. Bridges' participation.  A summary of one such recording and the recording, itself, are also attached hereto as Exhibit E.

Although Mr. Bridges introduced CWI to straw purchasers and was aware of the final destination of the firearms, the extent of his participation in the trafficking is overstated.  *See United States v. Gotti* 459 F.3d 296 (2d Cir. 2006) (the district court found that the defendant did not exhibit typical leadership characteristics).  He was part of a distribution chain with people he trusted, which is insufficient to justify a managerial role.  *See e.g., United States v. Pagan*, 196 F.3d 884 (7th Cir. 1999) (stating trust in defendant was insufficient for a managerial increase where there was no evidence that defendant directed the activities of anyone else); *United States v. Lopez-Sandoval*, 146 F.3d 712 (9th Cir. 1998) (finding no evidence that defendant arranged for the drug transactions or had authority over his coconspirators).  *See e.g., United States v. Stevens*, 985 F.2d 1175 (2d Cir. 1993) (court could not simply state that it had "no doubt" that defendant controlled operation without giving some explanation as to the evidentiary basis for its view).

In light of CWI's substantial involvement in the facilitation and the commission of this crime, the straw purchasers' independence, and Mr. Bridges' lack of supervision and control over the straw purchasers and the purchased firearms, this Court should decline to apply an aggravating role enhancement as sought by Probation and the Government.  *Compare United States v. Edwards*, 69 F.3d 419 (10th Cir. 1995) (defendant who organized conspiracy, set up elaborate courier system through use of coconspirator's trucking company, introduced coconspirator to conspiracy's major source

of cocaine, and exercised control over various members of conspiracy while he was incarcerated was properly determined to be § 3B1.1(a) leader of cocaine conspiracy.)

**C.      Mr. Bridges' History and Characteristics**

Information relating to Mr. Bridges' background and characteristics is detailed in the PSR at ¶¶ 60-84, his letter to the Court and the letters of support at Exhibits F and G respectively.  The following discussion draws from this source material and other items where noted.

Marquez Bridges, a 27-year old citizen of the United States, was born in York, Pennsylvania to the non-marital union of Charles Irving and Tiffany Bridges.  Mr. Bridges mother has a seizure disorder and collects Social Security Disability.  Mr. Bridges only met his father seven years ago, and his father is not involved in his life. Instead, Mr. Bridges is close with Louis Cardova who he considers his "father."  Mr. Bridges has two maternal half-siblings and two stepsiblings.  His siblings are all in good health.

Mr. Bridges has two daughters from separate relationships.  His oldest daughter is 7-years old and resides with her mother in Atlanta, Georgia.  His youngest daughter was born while Mr. Bridges was incarcerated.  Both children are in good health.  Mr. Bridges has been in a romantic relationship with his second daughter's mother, Amber Hannah, for over three years.  Mr. Bridges has always financially supported his family.

Mr. Bridges graduated from high school in York, Pennsylvania in 2008.  Shortly after graduation, he attended the Consolidated School of Business in his hometown but was unable to complete the program.  He left York and moved to Atlanta, Georgia where he received his Dental Assistant Certification following his completion of a vocational

program at the United Education Institute in Morrow, Georgia. *See* Exhibit H. He has been gainfully employed as a dental assistant since. PSR at ¶¶ 75-81.

Mr. Bridges' mother, a teenager herself, struggled with substance abuse and a seizure disorder, and was often absent during his childhood and adolescence. Mr. Bridges recalls witnessing his mother and her friends abusing pills and drugs around him when he was a child. His mother did not work and relied on public assistance.

Mr. Bridges' daughters occupy the most important and sacred place in his life. His friend, Amber L. Holland, informs the Court: "The bond he had with his own daughter was amazing. Sometimes I feel in this society its hard to find good fathers. Marquez was and still is the definition of a good father. His daughters and my children miss him tremendously!" His cousin, Tiffany L. Bridges, similarly states: "I have witnessed Marquez blossom from a boy to a man. A respectful, loyal, loving, caring man. A family man, most importantly a great father, A man so full of life." And Kyler Bullard, his former girlfriend and the mother of Bridges' eldest daughter, expresses: "I am very proud of Marquez and the mental and emotional growth he has made as a man, a friend, and most importantly a father. The love he has for his family is admirable…."

Mr. Bridges' positive qualities are not limited to his children. He is a friend who encourages others, as his cousin, Tiffany, states: "He is the person that has got me through Dental School, he guided me, stayed up long hours on the phone with me helping me study for finals, knowing he had to be to work the next morning bright and early, he pushed me to finish school every single time I felt like giving up."

As your Honor will see from the letters submitted on behalf of Mr. Bridges, the common theme they share is that he is loving, caring and decent.  His friend Amber writes:

> He is the kind of person that would take his shirt off of his back for someone in need. He was always and I mean always doing for EVERYONE. Personally sometimes I felt that he was too nice and trusting to people. I feel like people would take him for granted because he was so kind hearted.

Regarding the offense, Mr. Bridges' mother writes, "I don't see him reoffending because this experience has taught him a valuable lesson and he deeply regrets the mistakes he has made. This has made him appreciate his freedom and learned how easily it can be taken away."  And Kyler writes: "He has made mistakes in his past.  However, the most important part of making a mistake is learning from it, growing because of it, and moving on."  And his girlfriend, Amber Hannah, writes:

> But having deep conversations with Marquez I have learned that he regrets the mistakes he has made and has big plans on changing his life when he returns home.  He wants to pursue a career in real estate and he mentioned helping the community by hosting events for fathers on weekends to have fun with their children.  He is solely focused in his career and bettering his life.

Crucially, Mr. Bridges is deeply remorseful about his conduct, not only in terms of its effects on his family, but on its adverse effects on the society.  In his letter, he shares his thoughts about guns and gun violence:

> Your Honor, I take full responsibility for my actions.  I understand that I helped people get illegal weapons.  I understand that these weapons ended up in the wrong hands.  I understand that any of these guns could end up in another Sandy Hook, Vegas, Church or Parkland shooting.
>
> Being in jail has gotten me thinking about something I never really used to think all that much about, if ever, which is guns and violence.  I've owned firearms.  They were just there, sort of everyday.  But since my incarceration I've begun to think about

gun laws and why I did what I did, and I think about my kids and how the last thing I would want is for them to get hurt or killed by a gun like so many people you hear about.  I never considered other people's lives.

He further explains:

> … when I compare my behavior in this case with my own desire to keep my own family safe, I see how truly dangerous my actions were, and being locked up with so many men who are in different places and states of mind, I see how we become the choices we make.  In my case, I've put people in danger who have fathers and families who love them, and how my girls are a part of this country and how I worry about them so much because of how much violence there is, and how I contributed to it.  Everyday, I hope that the weapons I helped put out there don't hurt anyone.

> Thank you for reading this letter Your Honor.  I hope it helps you understand me better.  I want to start my life again.  I want to go back to real estate, and if I'm able to work as a dental assistance, but mainly I want to get back to my girls and provide them with best future I can.

**D.      Offense Conduct and Adjustment to Incarceration**

Mr. Bridges is best described as a non-violent offender.  He has been incarcerated since his June 2016 arrest, and been detained at the Metropolitan Detention Center ("MDC") since July 2016.  He has participated in several educational programs at the MDC, including Art, Health Education, Anger Management, and Resume Management programs.  *See* attached certificates at Exhibit I.

**E.      Mr. Bridges' Sentence Must Not Be Greater Than Necessary to Achieve the Goals of 18 U.S.C. § 3553(a) and Should Take into Account His History and Characteristics**

Mr. Bridges offense of conviction results in a maximum sentence of 5 years imprisonment.  The Court may impose a term of supervised release of no more than three years.  As calculated by counsel, Mr. Bridges faces an advisory Guidelines range of 41 to 51 months imprisonment.  The plea agreement sets forth an advisory Guidelines range of

51 to 63 months, based on the application of U.S.S.G. § 3B1.1(c), which Mr. Bridges is permitted to, and does, oppose.  Probation has projected an effective advisory Guidelines range of 60 months.  Mr. Bridges has been incarcerated for almost 23 months.  He respectfully requests that the Court imposes a non-Guidelines sentence of no more than 36 months of incarceration followed by a period of supervised release.

Even in the post-Booker era, the Sentencing Guidelines remain the sentencing regime of choice for Probation and Government in virtually every case.  However, this Court is not required to impose a sentence based on the advisory Guidelines or based on any policy of the Sentencing Commission that circumvents or curtails courts' roles in sentencing.  *Pepper v. United States*, 562 U.S. 476, 501 (2011).  In this case, a sentence at variance with the advisory Guidelines is appropriate because they fail to account for the critical factors in Mr. Bridges' background, which must be considered in arriving at the sentence to be imposed.  *See* 18 U.S.C. § 3553(a).

Sentencing courts must consider the background and history of the offender in arriving at a sentence that is sufficient but not greater than necessary to reach the goals set forth in 18 U.S.C. § 3553(a)(2).  The advisory Guidelines, on the other hand, say an individual's history and characteristics, such as his socio-economic status, education and vocational skills, employment record, family ties, mental health, and drug and alcohol dependency are not ordinarily relevant at sentencing, thus disregarding critical parts of a person's life.  *See* U.S.S.G. §§ 5H1.2 (Educational and Vocational Skills), 5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction), 5H1.5 (Employment Record), 5H1.6 (Family Ties), and 5H1.10 (Race, Sex, National Origin, Creed, Religion, and Socio-Economic Status).  When a defendant's

background and characteristics are ignored, marginalized, or reduced to second-class status, the goal of informative, individualized sentencing cannot be achieved.

Understanding and acknowledging a defendant's background is critical because such knowledge assists courts in determining sentences that are sufficient but not greater than necessary to reach the goals of sentencing. Without such knowledge regarding the factors that influenced a defendant towards the commission of the offense, the defendant is left to the mercy of mathematical numbers that arrive at terms of incarceration with zero empirical relationship to either punishment or the causes that brought the offender before the court for sentencing. *See United States v. Diaz*, No. 11 Cr. 00821 (JG) 2013 WL 322243, at 4-11 (E.D.N.Y. Jan. 28, 2013).

The illogic of this is shown by the fact that the advisory Guidelines arrive at sentencing ranges that include offenders' criminal histories – to aggravate their sentences – but fail to include any relevant mitigating circumstances in offenders' backgrounds. This lopsided formula fails to balance the important interplay between aggravating and mitigating sentencing factors, which must be considered in order to arrive at a sentence that adequately considers offenders' backgrounds.

In this case, a sentence at variance with the advisory Guidelines is appropriate because a Guidelines sentence fails to take into account critical factors, here: Mr. Bridges' socio-economic status, employment history, physical and mental health, and close family ties, which must be included in arriving at the sentence to be imposed. *See* 18 U.S.C. § 3553(a).

Mr. Bridges is not responsible for the circumstances he was born into, but he is, of course, not blameless. His sentence must balance the circumstances relevant to his life

history and provide rehabilitation.  Courts continue to observe how adverse socio-

economic conditions affect defendants and their relationship with the criminal justice

system:

> Had the defendants been raised by cohesive, adequate
> families, most of the difficulties they encountered would
> probably never have come to pass.  Well-resourced,
> attentive parents would have had the knowledge, ability,
> and insight to protect their children from many of the
> difficulties that befell these defendants in their youth, to
> obtain assistance to deal with their psychological and
> physical problems, and to obtain crucial opportunities for
> education, work, and personal growth.  Even those with
> learning disabilities would likely have been provided
> available resources to overcome their impairments at public
> expense.  That the defendants were born into circumstances
> without such support is at the center of this tragedy.

*United States v. Bannister*, 786 F. Supp. 2d 617, 688-89 (E.D.N.Y. 2011).  Mr. Bridges

grew up in a chaotic and neglected environment without a father, and with often absent

and unemployed mother who struggled with addiction.  Mr. Bridges' grandmother tried

to fill the void.  However, her well-intended efforts were not enough to prevent him from

being scarred in the process.  *See* PSR at ¶¶ 62, 63 and Exhibits F and G (letters from

Amber L. Holland, Alexandria Bridges, and Marilyn Bridges).

Despite these adverse circumstances, Mr. Bridges has strived to do better.  He

moved to Atlanta to find more educational and vocational opportunities.  There he

received his dental assistance degree under difficult financial circumstance, as his mother

recalls:

> While in college, he didn't have it easy. He had no permanent
> residence and slept in his car most nights before given the
> opportunity to stay with a close friend of the family. I begged him
> to come back to Pennsylvania but he was determined to finish
> school by any means necessary.

*See* Exhibit G.

In school, Mr. Bridges dedicated himself and excelled.  *See* Exhibit H (Perfect Attendance).  And after graduation, he maintained steady employment as a dental assistant.  He was passionate about his career, and often appeared at the top of the weekly list rating dental assistants for delivering patient care.  *See* Exhibit H (Patient Rating).  Mr. Bridges' sentence should reflect his education and work history because they demonstrate his seriousness and devotion to improving his life and caring for his family.  This is a factor weighing in favor of a variance.

Mr. Bridges' family ties are also very strong, and his absence has been deeply felt, as his cousin Tiffany describes, "Since Marquez arrest things haven't been the same with the family he was the man of the family, him being away is stress on all of us, but my grandmother is the heart of us all.  She is sick and that is something Marquez has always been so worried about…."  *See* Exhibit G.  Although, defendants' family ties are not ordinarily relevant at sentencing, the adverse consequences, of Mr. Bridges' absence, favor a variance.

Mr. Bridges is in his late twenties, and while age alone is not ordinarily relevant in determining whether a defendant should receive a variance, his age should be viewed in the context of the other factors that make up his offender characteristics.  Though not a child, he was still vulnerable to impulsivity, which was compounded by the caustic environment and negative influences he grew up in.  Mr. Bridges has matured since he committed the offense as his former girlfriend, Kyler, describes:

> When Marquez calls me from prison, I am always amazed at how much he has changed. He values the small things in life. He has taken the time to appreciate the things in life that cannot be bought. I remember having many conversations with Marquez and he tells me about his aspirations when he comes home.  His number one and most important aspiration is rebuilding his relationship with

> his daughter. It always makes me laugh when they speak on the
> phone.

In this context, there is a more constructive alternative to a prolonged period of

incarceration.  *See e.g, United States v. Smith*, 909 F.2d 1164 (8th Cir. 1980) (downward

departure justified based on age where the defendant was sentenced as a career offender

for crimes committed shortly after his nineteenth birthday).

Mr. Bridges' mental health is another basis for a non-Guidelines sentence.

Pursuant to 18 U.S.C. § 3553(a)'s mandate sentencing courts should consider the need to

provide medical care, or other treatment to offenders.  Even under the Guidelines regime,

a defendant's physical condition "may be relevant in determining whether a departure is

warranted, if, individually or in combination with other offender characteristics, it is

present to an unusual degree and distinguishes the case from the typical cases covered by

the guidelines." *See* U.S.S.G. § 5H1.4; *see also*, *United States v. Rioux*, 97 F.3d at 663

(2d Cir. 1996) (upholding district court's conclusion that, in combination, defendant's

medical condition and charitable and civic good deeds warranted downward departure).

Mr. Bridges has suffered from periods of anxiety and depression and has met with

MDC's medical staff about these issues as stated in the PSR at ¶ 71, and this factor

should also be considered.  Mr. Bridges was recently prescribed buspirone for these

conditions.

Further, while drug or alcohol dependence or abuse is not necessarily relevant

under the advisory Guidelines, *see United States v. Maier*, 975 F.2d 944, 948 (2d Cir.

1992) (the Second Circuit held that the awareness of one's drug dependence "and the

demonstrated willingness to act to achieve rehabilitation, thereby benefiting the

individual and society," is a reason for an adjustment), it is a factor the Court should

consider, regarding a variance, because Mr. Bridges has abused alcohol as mentioned in the PSR at ¶ 72.

The Court should also consider the collateral consequences of Mr. Bridges' conviction, which has been found to be consistent with § 3553(a)'s directive. *See United States v. Stewart*, 590 F.3d 93, 141 (2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.") Having a felony conviction will have a dramatic impact on Mr. Bridges' ability to find a good job and support his family.[1]  This amounts to further punishment.

It is also relevant that Mr. Bridges has been incarcerated at the MDC for almost 23 months.  His confinement conditions may be considered in determining his appropriate sentence.  *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) ("pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.")  *See e.g., United States v. Hernandez-Santiago*, 92 F.3d 97, 101 (2d. Cir. 1996) ("harsher incarceration" in state facility as compared to federal facility justified sentencing adjustment; the government did not challenge adjustment on appeal); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (pre-sentence conditions "effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines.")

---

[1] NEW YORK TIMES, *Out of Trouble, but Criminal Records Keep Men Out of Work, available at* http://www.nytimes.com/2015/03/01/business/out-of-trouble-but-criminal-records-keep-men-out-of-work.html; and WASHINGTON POST, *Our criminal justice system is making it really hard for people to find jobs,* available at https://www.washingtonpost.com/posteverything/wp/2014/09/30/our-criminal-justice-system-is-making-it-really-hard-for-the-poor-to-find-jobs/?utm_term=.97c6b96fa683.

Finally, the length of Mr. Bridges' incarceration as a general and specific deterrent is another factor that needs to be considered in the sentencing analysis. *See* 18 U.S.C. 3553(a)(2)(B).  A recent order issued in *United States v. Murray Lawrence*, Eastern District of New York, 16 Cr. 243, Document 73, analyzed the issue of whether a longer jail sentence was appropriate "… to have a general deterrent effect on future gun crimes." *Id.* at 3.  After listening to testimony from both experts the court agreed with the defense expert that "[a] decision not to commit the crime requires knowledge by the would-be-offender of the law prohibiting the act, the risks of detection, and the risks of punishment; it assumes that each potential offender is capable of rationally weighing the costs and benefits of decision." *Id.* at 4.  The court also noted that would-be-offenders "would have to have some idea of what sentence was ultimately imposed on [the *Lawrence* defendant,] appreciate the likelihood of detection and of the federal sentencing guidelines, and engage in a rational cost-benefit analysis. This process in unlikely…" *Id.* at 8.  Therefore, the court concluded that "… imposing a long incarcerative sentence on [the defendant] in order to deter future gun violence [either by the defendant] or by members of the community seem[ed] futile." *Id.*

The court also discussed long prison sentences' adverse effects on the communities:

> [D]efendants are usually incapable of making substantial contributions to their communities and families while they are incarcerated after a long sentence has been served.  The large number of people who come from deprived communities and are imprisoned, and their absence while in prison, has a disastrous political, social, and economic effect on their communities and on the families they come from or missed having.

*Id.* at 9.  The court noted that "[t]he compassion and empathy due a defendant denied an appropriate middle-class upbringing and education should, in theory, have no effect in

calculating deterrence elements.  But they do[,]" *id.* at 10, and that applies to Mr. Bridges.

In this context, Mr. Bridges continues to reflect on how his actions have hurt his community and loved ones, which undoubtedly will serve as a deterrent against future recidivism, and imposing a prolonged sentence on Mr. Bridges will not necessarily serve as a further deterrent either for him or for the community at large.  Therefore, the imposition of a sentence of no more than 36 months incarceration followed by supervised release is sufficient to deter Mr. Bridges against any future recidivism.  *See* U.S.S.G. §4A1.3.

**F.      Conclusion**

We respectfully urge the Court to vary from the advisory Guidelines range based on the 18 U.S.C. § 3553(a) factors set forth in this memorandum and impose a sentence of no more than 36 months incarceration followed by a period of supervised release. That is a significant life-changing penalty that amply punishes Mr. Bridges for his offense conduct, maintains and encourages respect for the administration of justice, and serves as individual and general deterrents.  It is, in short, a sufficient, but not greater than necessary sentence.

Mr. Bridges respectfully reserves the right to raise additional issues, if necessary, at the time of sentencing.

Because Exhibits D and E concern government disclosures that were provided to the defense, pursuant to protective orders, I request that they be filed under seal.

Dated:          Brooklyn, New York
                May 4, 2018

                              Respectfully submitted,


                              ____s/_____
                              MICHAEL HUESTON, ESQ.
                              *Attorney for Defendant Marquez Bridges*
                              16 Court Street, Suite 1800
                              Brooklyn, New York 11241
                              (718) 246-2900

                              Mehmet Baysan, Esq.
                              *Associate Counsel for Defendant Marquez Bridges*

21

## DECLARATION OF SERVICE

Michael Hueston, declares under penalty of perjury and pursuant to 28

U.S.C. § 1746, that the following is true and correct:

On May 4, 2018, I served the annexed Sentencing Memorandum and

Exhibits on:

       Rena Paul and Mathew S. Miller
       Assistant United States Attorneys
       United States Attorney for
       Eastern District of New York
       271 Cadman Plaza East
       Brooklyn, New York 11201

    [X]    BY ELECTRONIC CASE FILING
    [X]    BY EMAIL
    [X]    BY HAND (Recordings provided in Exhibit E)
    [ ]    BY FIRST CLASS MAIL
    [ ]    BY FACSIMILE WITH PERMISSION

Dated:       Brooklyn, New York
            May 4, 2018

                ___s/_____
                MICHAEL HUESTON, ESQ.
                *Attorney for Defendant*
                16 Court Street, Suite 1800
                Brooklyn, New York 11241
                (718) 246-2900